IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

PITTSBURGH LOGISTICS                    )
SYSTEMS, INC., d/b/a PLS Logistics      )
Services,                               )
                                        )
            Plaintiff,                  )
                                        )
      v.                                )      Civil No. 20-817
                                        )
COX LOGISTICS LLC, COX LOGISTICS        )
MANAGEMENT, LLC, and COX                )
BROKERAGE, LLC,                         )
                                        )
            Defendants.                 )

## MEMORANDUM OPINION

Presently before the Court is the Motion to Dismiss and brief in support thereof filed by Defendants Cox Logistics LLC, Cox Brokerage, LLC, and Cox Logistics Management, LLC (Docket Nos. 8, 9), the response in opposition thereto filed by Plaintiff Pittsburgh Logistics Systems, Inc. d/b/a PLS Logistics Services (Docket Nos. 14, 15), and Defendants' reply (Docket No. 16). For the reasons set forth herein, Defendants' Motion to Dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) is granted without prejudice to amendment with sufficient facts to state a claim.

## I. Background

As alleged in the Complaint, Plaintiff Pittsburgh Logistics Systems, Inc. d/b/a PLS Logistics Services ("PLS") provides third-party logistics services by coordinating the transportation of freight between its customers and carriers. (Docket No. 1, ¶¶ 1, 7). PLS serves as a broker, or middleman, between clients who need to transport their cargo ("customers") and

trucking and other transport companies ("carriers") who agree to move cargo for PLS's customers.  (Id. ¶ 9).  PLS alleges that Defendant Cox Logistics LLC ("Cox Logistics"), which operates its own trucks and employs its own drivers, has operated as a carrier for PLS.  (Id. ¶¶ 2, 13, 17).  Defendant Cox Brokerage, LLC ("Cox Brokerage"), as alleged, is a freight brokerage operated by Cox Logistics and directly competes with PLS.  (Id. ¶¶ 4, 66).  PLS claims that Cox Brokerage and Defendant Cox Logistics Management, LLC ("Cox Management") share managers, owners, members and/or other employees with Cox Logistics.[1]  (Id. ¶¶ 3, 35, 60).

PLS avers that it operates a website, "PLSPRO.com," through which carriers may make offers to ship freight for PLS's customers.  (Docket No. 1-2 at 2).  According to the Complaint, the "Pittsburgh Logistics Systems (PLS PRO) Carrier Terms of Use" ("Terms of Use," attached to the Complaint) are available on the PLS website and provide that, in order for carriers to register to use the website, they must provide PLS with specific documentation, submission of which indicates acknowledgement that the carrier has read and accepted the terms and conditions contained in the Terms of Use.[2]  (Docket Nos. 1, ¶ 15; 1-2 at 2).  The bidding procedure that is customarily followed by PLS and its carriers is set forth in the Terms of Use, according to which, after a carrier submits a bid and before it ships freight, PLS sends the carrier an "Award Confirmation" that details the terms of the transaction and refers the carrier back to the Terms of Use for conditions of the rate agreement and payment terms.  (Docket Nos. 1, ¶ 14; 1-2 at 2; Oral Argument regarding Defendants' Motion to Dismiss, held on Jan. 27, 2021 ("Oral Argument")[3]).  The Terms of Use also contain a clause that describes shipment information on the website as

---

[1]     According to the Complaint, PLS is a corporation formed under the laws of the Commonwealth of Pennsylvania, and Cox Logistics, Cox Brokerage and Cox Management are all limited liability companies formed under the laws of the State of Texas.  (Docket No. 1, ¶¶ 1-4).

[2]     The Terms of Use specifically provide that "PLSPRO.com, as used [t]herein, shall also include" PLS. (Docket No. 1-2 at 2, n.1).

[3]     An official transcript of the hearing during which oral argument was held has not been produced as of this date.  Therefore, the Court discusses the testimony presented by reference to an unofficial draft of the transcript.

"proprietary and confidential," and purports to prohibit back-solicitation of PLS's customers and circumvention of PLS's services by its carriers.  (Docket No. 1-2 at 5, ¶ 11).

According to the Complaint, on or about May 14, 2015, PLS and one of its customers, JSW Steel, entered into a three-year agreement in which the parties agreed that PLS would be the exclusive provider of logistics services to JSW Steel.  (Docket Nos. 1, ¶¶ 28, 32; 1-6, ¶ 1).  On May 15, 2018, the PLS-JSW Steel agreement automatically renewed for an additional three-year period ending May 15, 2021.  (Docket No. 1, ¶ 28).  PLS claims that Cox Logistics, while operating as a carrier for PLS, transported 602 loads of freight for JSW Steel between January 2019 and February 2020.  (Id. ¶ 18).

As discussed in greater detail, infra, PLS contends that Cox Logistics knew about PLS's exclusive contract with JSW Steel, and that Cox Logistics knew that the Terms of Use prohibited it from back-soliciting PLS's customers or circumventing PLS's services.  (Id. ¶¶ 33-34, 38; Docket Nos. 1-7, 1-8; Oral Argument, supra, at 2 n.3).  Nevertheless, according to PLS, Defendants have attempted, are attempting, and will continue to circumvent PLS's exclusive contract with JSW Steel by providing logistics services and/or carrier services directly to JSW Steel.  (Docket No. 1, ¶ 35).  PLS also alleges that Cox Management and Cox Brokerage are aware of and are encouraging or actively assisting Cox Logistics' conduct "by nature of managers or other employees it shares with" Cox Logistics.  (Id.).

On June 3, 2020, PLS filed its Complaint, alleging five claims:  (I) breach of contract against Cox Logistics; (II) unjust enrichment against all Defendants; (III) tortious interference with business relations against all Defendants; (IV) misappropriation of trade secrets against all Defendants; and (V) requesting preliminary and permanent injunctions against all Defendants.  PLS seeks damages in excess of $75,000.00, plus attorney fees, court costs and any other

equitable relief that the Court deems necessary to enjoin and prevent the harms complained of in the Complaint.  Defendants have filed a motion to dismiss all counts pursuant to Rule 12(b)(6) for failure to state claims upon which relief can be granted.

## II.  <u>Standard of Review</u>

In considering a Rule 12(b)(6) motion to dismiss, the factual allegations contained in the complaint must be accepted as true and must be construed in the light most favorable to the plaintiff, and the court must "'determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief.'"  <u>Phillips v. County of Allegheny</u>, 515 F.3d 224, 231 (3d Cir. 2008) (quoting <u>Pinker v. Roche Holdings Ltd.</u>, 292 F.3d 361, 374 n.7 (3d Cir. 2002)); <u>see</u> <u>Bell Atlantic Corp. v. Twombly</u>, 550 U.S. 544, 563 n.8 (2007).  While Federal Rule of Civil Procedure 8(a)(2) requires only "a short and plain statement of the claim showing that the pleader is entitled to relief," the complaint must "'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'"   <u>Phillips</u>, 515 F.3d at 231 (quoting <u>Twombly</u>, 550 U.S. at 555 (additional internal citation omitted)).  Moreover, while "this standard does not require 'detailed factual allegations,'" Rule 8 "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation."   <u>Id.</u> (quoting <u>Twombly</u>, 550 U.S. at 555); <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 678 (2009) (citing <u>Twombly</u>, 550 U.S. at 555).

It should be further noted, therefore, that in order to survive a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"   <u>Iqbal</u>, 556 U.S. at 678 (quoting <u>Twombly</u>, 550 U.S. at 570).  The Supreme Court has noted that a "claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  <u>Id.</u> (citing <u>Twombly</u>, 550 U.S. at 556).  The standard "'does not impose a

probability requirement at the pleading stage,' but instead 'simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of' the necessary element." Phillips, 515 F.3d at 234 (quoting Twombly, 550 U.S. at 556).  Moreover, the requirement that a court accept as true all factual allegations does not extend to legal conclusions; thus, a court is "'not bound to accept as true a legal conclusion couched as a factual allegation.'"  Iqbal, 556 U.S. at 678 (quoting Twombly, 550 U.S. at 555 (internal citation omitted)).

### III.  Legal Analysis

#### A.  Count I:  Breach of Contract (PLS v. Cox Logistics)

PLS alleges a claim for breach of contract against Cox Logistics in Count I of its Complaint.  (Docket No. 1, ¶¶ 41-48).  More specifically, PLS claims that Cox Logistics breached a contract with PLS, as set forth in Paragraph 11 of the Terms of Use, by circumventing PLS's brokerage services and instead directly "back soliciting" PLS's customer, JSW Steel.  (Id. ¶¶ 42-44).  Cox Logistics moves to dismiss this contract claim by contending: (i) that the Complaint fails to plead that PLS and Cox Logistics reached a mutual understanding that the Terms of Use govern their business relationship; and (ii) that the Complaint fails to plead that Cox Logistics breached a duty imposed by the Terms of Use.

In order to establish a breach of contract claim under Pennsylvania law, a plaintiff must plead and prove:  "(1) the existence of a contract, including its essential terms, (2) a breach of a duty imposed by the contract; and (3) resultant damages."  CoreStates Bank, N.A. v. Cutillo, 723 A.2d 1053, 1058 (Pa. Super. Ct. 1999) (citing Gen. State Auth. v. Coleman Cable & Wire Co., 365 A.2d 1347, 1349 (1976)).  "While not every term of a contract must be stated in complete detail, every element must be specifically pleaded."  Id. (citing Snaith v. Snaith, 422 A.2d 1379, 1382 (Pa. Super. Ct. 1980) (internal citations omitted)).  A contract is formed when the parties:

"1) reach a mutual understanding, 2) exchange consideration, and 3) delineate the terms of their bargain with sufficient clarity."  Weavertown Transp. Leasing, Inc. v. Moran, 834 A.2d 1169, 1172 (Pa. Super. Ct. 2003).  Furthermore, "[t]he touchstone of any valid contract is mutual assent and consideration."  Bair v. Manor Care of Elizabethtown, 108 A.3d 94, 96 (Pa. Super. Ct. 2015).

PLS alleges in its Complaint that: (1) the Terms of Use constitute a contract between it and Cox Logistics; (2) Cox Logistics breached its duties under the Terms of Use by circumventing PLS's services and soliciting JSW Steel; and (3) PLS has suffered damages as a result.  (Docket No. 1, ¶¶ 42-45).  Cox Logistics argues, however, that the Complaint does not allege facts showing that the Terms of Use constitute a contract between it and PLS because PLS does not allege that Cox Logistics ever *accepted* the Terms of Use, and therefore does not allege the parties' mutual assent to those Terms of Use.

As previously noted, PLS's Terms of Use are found on its PLSPRO.com website, through which registered users, designated as "Carriers" or "Registered Carriers," may make offers to provide transportation services for PLS's customers.[4]  (Docket No. 1-2 at 2).  Once registered to use the website, carriers may make offers to provide transportation services for listed shipments of PLS's customers by entering a proposed rate and, if and when such rate for a specified shipment is accepted by PLSPRO.com, a "binding agreement for transportation services" is formed for that shipment.  (Id. at 2, ¶ 1).  The Terms of Use "describe the terms and conditions applicable to [carriers'] use of this Site" and state that they "shall apply to all transactions awarded through it."  (Id. at 2).

---

[4]      According to these Terms of Use, use of the PLSPRO.com website also affords registered carriers the ability to "participate in the carrier community, and gain access to relevant industry information and services." (Docket No. 1-2 at 2).

To accept PLS's Terms of Use and thus to gain access to the PLSPRO.com website wherein registered carriers may bid on shipments, a carrier must first submit through PLSPRO.com its operating authority, insurance certificate, and completed W-9 Form.  (Id.).  By doing so, such carrier "ACKNOWLEDGE[S] THAT [IT] [HAS] READ AND ACCEPT[ED] THE TERMS AND CONDITIONS CONTAINED [T]HEREIN."   (Id. (capitalization in original)).

Here, PLS has not pled that Cox Logistics submitted its documented operating authority, insurance certificate, and W9 in order to accept the Terms of Use and thus become a registered carrier even though, at oral argument, PLS conceded that the only way a carrier could accept or agree to the Terms of Use during the relevant time period was by submitting this specified documentation.  (Oral Argument, supra, at 2 n.3).  The Court also notes that PLS does not even allege that Cox Logistics used the PLSPRO.com website.  Therefore, the Court finds that the Complaint does not allege—nor does PLS argue in its briefing and oral argument—that Cox Logistics accepted the Terms of Use by registering on the website in the prescribed manner.  See, e.g., Van Schoiack v. U.S. Liab. Ins. Co., 133 A.2d 509, 514 (Pa. 1957) ("It is settled law that the offeror is the master of his offer, and his provision as to time, place and manner or mode of acceptance.").

Nevertheless, PLS claims that it adequately pled facts from which the Court could infer that the Terms of Use constitute a contract between it and Cox Logistics.  In making this argument, PLS points to certain allegations in the Complaint pertaining to PLS's Award Confirmations that, according to its usual practice, are sent to its carriers to "detail[] the terms of the transaction and form[] the basis of the agreement between PLS and its partner-carrier." (Docket No. 1, ¶ 14; see also ¶¶ 15, 17, 20; Docket No. 1-2 at 2, ¶ 1; Oral Argument, supra, at 2

7

n.3).  PLS contends that Award Confirmations are sent before carriers ship freight for PLS's customers, and that they incorporate the Terms of Use and inform the carriers that they are bound by those terms.  (Docket No. 1, ¶¶ 14-15; Oral Argument, <u>supra</u>, at 2 n.3).  PLS also alleges that all its carriers who accept loads of freight from PLS *agree to be bound* by PLS's Terms of Use.  (Docket No. 1, ¶¶ 15, 17, 20; Oral Argument, <u>supra</u>, at 2 n.3).

However, the Court agrees with Defendants that PLS's allegations, which aver only generalized practices of PLS and its carriers, do not plead that PLS and Cox Logistics mutually assented to the Terms of Use.  For instance, in Paragraph 14 of the Complaint, PLS avers that "[w]hen *a motor carrier* accepts the responsibility of moving freight for a PLS customer, the motor carrier is sent an Award Confirmation . . . ."  (Docket No. 1, ¶ 14) (emphasis added).  From there, the Complaint avers that the Award Confirmation contains references to the Terms of Use on its PLSPRO.com website.  (<u>Id.</u>).  Then, PLS baldly alleges that "[a]ll motor carriers that accept freight from PLS agree to be bound by PLS's Terms of Use."   (<u>Id.</u> ¶ 15).  Notwithstanding these generalized allegations about what PLS and its unidentified carriers generally do, PLS concludes, referring to Cox Logistics: "*Like all of PLS's partner-carriers,* when Cox Logistics accepts freight for transportation for a PLS customer, Cox Logistics agrees to be bound by PLS's Terms of Use."  (<u>Id.</u> ¶ 17 (emphasis added)).

PLS makes no factual allegations in its Complaint describing how Cox Logistics agreed to the Terms of Use.  PLS does not allege that Cox Logistics was a registered user of its PLSPRO.com website, nor does it allege how, factually, Cox Logistics agreed to the Terms of Use as prescribed.  In fact, the Complaint is silent as to how or under what terms Cox Logistics agreed to ship freight for PLS's customers, how offers to ship were made and accepted, and at what point such agreements were formed.  Therefore, such allegation that Cox Logistics agreed

to the Terms of Use when it accepted freight *"like all of"* PLS's carriers is a conclusory statement, without factual support, and does not adequately allege that the Terms of Use governed or otherwise applied to the parties' business relationship.

PLS does not allege that it and Cox Logistics operated like PLS does with those generic, unidentified "partner-carriers," "motor carriers," or simply "carriers" that are referenced throughout the Complaint. And, while PLS avers that Cox Logistics accepted 602 loads of JSW Steel's freight from it (id. ¶ 18), nowhere in the Complaint does PLS aver that Cox Logistics received an Award Confirmation pertaining to any of those shipment transactions. At most, PLS merely imbeds into Paragraph 14 of the Complaint an "example" of an Award Confirmation. (Id. ¶ 14). The Complaint fails to allege, however, whether this "example" is a copy of an actual Award Confirmation that Cox Logistics received from PLS before it provided actual transportation services to a specific PLS customer.[5] Paragraph 14 (indeed the entire Complaint) is devoid of any such factual allegations that would permit the Court to draw such an inference.

In support of their motion to dismiss, Defendants rely upon a recent decision involving PLS from the Pennsylvania Superior Court to urge a similar result. See Pittsburgh Logistics Systems, Inc. v. B. Keppell Trucking, LLC, 153 A.3d 1091 (Pa. Super. Ct. 2017). The B. Keppell court evaluated whether PLS's Terms of Use or a separate and distinct Motor Carrier Service Contract ("MCSC") governed the business relationship between PLS and one of its carriers, and it concluded that the MCSC governed rather than the Terms of Use.

B. Keppell is instructive here. Just as the B. Keppell court determined that the carrier in that case never placed a bid via the PLS website and never operated under the Terms of Use, but instead operated under a separate written agreement, i.e., the MCSC (see id. at 1094-95), PLS's

---

[5]    It is unclear whether this "example" shows an actual, albeit redacted, Award Confirmation, or whether it references a demonstrative "example" created simply to show a typical Award Confirmation.

Complaint in the case at bar alleges that Cox Logistics operated as a carrier for at least one of PLS's customers, but does not allege that Cox Logistics accepted PLS's Terms of Use by becoming a Registered Carrier nor does it allege that Cox Logistics ever used the PLSPRO.com website to submit bids on loads or for any other purpose.  (Docket No. 1, ¶¶ 17, 18).  The Complaint here is devoid of factual allegations showing that Cox Logistics accepted the Terms of Use and, thus, that those terms were mutually agreed upon by PLS and Cox Logistics. Accordingly, because PLS has failed to plead such mutual understanding, the Court finds that PLS has failed to allege sufficient facts to support its claim for breach of contract under Pennsylvania law.

Furthermore, even if PLS pled, or could plead, the existence of a mutual understanding that the Terms of Use contractually govern its relationship with Cox Logistics, PLS nonetheless failed to plead that Cox Logistics breached the Terms of Use by purportedly back-soliciting PLS's customer, JSW Steel, or by circumventing PLS's services to do business directly with JSW Steel. (Id. ¶¶ 16 – 25, 41 – 48).

The back-solicitation and circumvention prohibitions relied upon by PLS are set forth in Paragraph 11 of the Terms of Use, which, in its entirety, states:

> All shipment information *on the Site* is proprietary and confidential to PLSPRO.com.  CARRIER agrees *not to use this Site* to identify shippers of freight and back solicit or circumvent the services of PLSPRO.com.

(Docket 1-2 at 5, ¶ 11) (emphasis added)).  Yet, critically missing from PLS's Complaint are any averments to establish that Cox Logistics identified JSW Steel or any other shippers by using PLS's website.  In fact, the Complaint is devoid of any averments to infer that Cox Logistics ever *used* PLS's website, even though to state a cognizable breach of contract claim based upon

Paragraph 11 of the Terms of Use, PLS would need to aver, at a minimum, not only that Cox Logistics used the PLSPRO.com website, but that it specifically used the website to identify shippers such as JSW Steel and then back-solicit or otherwise circumvent PLS's brokerage services to do business with such shippers directly.  PLS has not made these allegations in its Complaint and thus failed to state a cognizable breach of contract claim.

For the foregoing reasons, Count I of the Complaint will be dismissed without prejudice.

**B.  Underline Count II:  Unjust Enrichment (PLS v. Cox Logistics, Cox Brokerage, and Cox Management)**

As an alternative to its breach of contract claim against Cox Logistics, PLS alleges a claim for unjust enrichment against Cox Logistics, Cox Brokerage and Cox Management in Count II of the Complaint.  (Docket No. 1, ¶¶ 49-54).  More specifically, PLS asserts that, if the Court does not find that the Terms of Use constitute a contract between PLS and Cox Logistics, then PLS is still entitled to an award of damages against all three Defendants[6] based on a theory of unjust enrichment.  Defendants argue, however, that PLS has not sufficiently pled the elements necessary to prove its unjust enrichment claim.

In order to recover damages for a claim of unjust enrichment under applicable Pennsylvania law, a plaintiff must plead and prove the existence of "'[1] benefits conferred on defendant by plaintiff, [2] appreciation of such benefits by defendant, and [3] acceptance and retention of such benefits under such circumstances that it would be inequitable for defendant to retain the benefit without payment of value.'"  Schenck v. K.E. David, Ltd., 666 A.2d 327, 328

---

[6]     The Court notes that, throughout the Complaint, PLS refers to Defendants singly or in combination, sometimes seemingly at random, but does not argue that the Court should disregard Defendants' separate and autonomous legal forms.  In Count II, for example, the specific allegations included therein refer only to actions of Cox Logistics, yet PLS also alleges that all three Defendants "have unjustly enriched themselves at the expense of PLS."  (Docket No. 1, ¶ 53).  Otherwise, the only connection Cox Brokerage and Cox Management are alleged to have to Count II is the general allegation that they are "aware of and encouraging or actively assisting with Cox Logistics' improper conduct by nature of managers or other employees" they share with Cox Logistics.  (Id. ¶ 35).

(Pa. Super. Ct. 1995) (quoting Wolf v. Wolf, 514 A.2d 901, 905-06 (Pa. Super. Ct. 1986), overruled on other grounds, Van Buskirk v. Van Buskirk, 590 A.2d 4 (Pa. 1991)).   Unjust enrichment is an equitable remedy, and "[w]here unjust enrichment is found, the law implies a contract, referred to as either a *quasi contract* or a contract implied in law, which requires that the defendant pay to plaintiff the value of the benefit conferred."  Schenck v. K.E. David, Ltd., 666 A.2d at 328–29 (citing Chesney v. Stevens, 644 A.2d 1240 (Pa. Super. Ct. 1994); Schott v. Westinghouse Elec. Corp., 259 A.2d 443, 449 (Pa. 1969)).  "The most important factor . . . is whether the enrichment of the defendant is unjust."  Walter v. Magee–Womens Hosp., 876 A.2d 400, 407 (Pa. Super. Ct. 2005) (quoting Schenck, 666 A.2d at 328).  Thus, an unjust enrichment claim cannot be made simply because the defendant may have been benefited in some way.  See id.

As with Count I, the gravamen of Count II is Cox Logistics' alleged direct dealing with PLS's customer JSW Steel.  PLS asserts that "[t]he value of a relationship with JSW Steel cannot be understated, but it can be quantified by measure of the revenue that results from having a business relationship with JSW Steel."  (Docket No. 1, ¶ 50).  PLS then avers that Cox Logistics' relationship with JSW Steel developed because PLS contracted with Cox Logistics in the past to carry freight for JSW Steel, and that such relationship "arose under PLS's exclusive contract with JSW Steel."  (Id. ¶ 51).  Accordingly, in pleading its unjust enrichment claim, PLS alleges that:  (1) the valuable business relationship between Cox Logistics and JSW Steel is the benefit that PLS conferred on Cox Logistics in the course of PLS's past "contracting" with Cox Logistics to carry freight for JSW Steel; (2) Cox Logistics received that benefit; and (3) all three Defendants have unjustly enriched themselves at the expense of PLS and thus it would be inequitable for Defendants to retain such benefit without payment to PLS for the value of PLS's

investment of time, money and resources into establishing and maintaining its own business relationship with JSW Steel, as well as disgorgement of any profits Cox Logistics received from its direct dealings with JSW Steel.  (Id. ¶¶ 52-54).

Upon a careful review of the Complaint, the Court finds that PLS adequately alleges that it conferred a benefit on Cox Logistics and that Cox Logistics has appreciated that benefit; the benefit being the brokered "freight transportation services to PLS customers like JSW Steel" and the relationship that arose between Cox Logistics and JSW Steel due to Cox Logistics' provision of such services to JSW Steel "in the past."  (Id. ¶¶ 17, 51, 52).  Upon consideration of PLS's allegations in their entirety, however, the Court finds that PLS has failed to allege facts to show that it would be inequitable for Cox Logistics to retain such benefit without payment to PLS such that the alleged enrichment of Cox Logistics (and of Cox Brokerage and Cox Management) was unjust.

In order to plead this third and most important element of its unjust enrichment claim, PLS must allege facts showing "acceptance and retention" of the benefit at issue under circumstances that would make it inequitable for Cox Logistics to retain that benefit without payment of value to PLS.  Here, PLS's allegations are insufficient.  It is simply unclear from the allegations in the Complaint how Cox Logistics' acceptance and retention of its business relationship with JSW Steel has taken place under circumstances that would make it inequitable for Cox Logistics to retain that relationship without payment of value to PLS.

Although the Court has found that PLS has not sufficiently pled that the Terms of Use contractually govern its relationship with Cox Logistics, as discussed, supra, the Court finds that PLS has alleged that it and Cox Logistics have a business relationship through which Cox Logistics shipped freight for JSW Steel and other PLS customers.  Therefore, for purposes of

considering whether PLS has pled a claim of unjust enrichment, the Court views such agreement to ship freight for JSW Steel as the past "contracting" to which PLS refers.

The details of the business arrangement between PLS and Cox Logistics are not pled in the Complaint and, in fact, to the extent PLS pleads the existence of documentation of the loads shipped under such arrangement, most details contained therein have been redacted. (Docket No. 1-3 (redaction in original attachment)). Nevertheless, although PLS does not claim that Cox Logistics violated any terms of their unspecified business arrangement, i.e., there is no allegation that Cox Logistics received payment for services it did not provide,[7] PLS does allege that Cox Logistics has "now capitalized" on its own relationship with JSW Steel  "by circumventing PLS's contract with JSW Steel" in order to work directly with JSW Steel while "cutting out PLS." (Id. ¶ 52; Oral Argument, supra, at 2 n.3). Moreover, PLS alleges that "[i]t would be inequitable for Defendants to retain these benefits without payment to PLS of value" representing PLS's investment in its own business relationship with JSW Steel and "disgorgement of any profits Cox Logistics unjustly received through its *unlawful direct or indirect transactions* with JSW Steel." (Docket No. 1, ¶ 54 (emphasis added)).

However, the Court finds that PLS failed to allege facts to support its conclusory allegation that Cox Logistics and its co-defendants were unjustly enriched by the relationship that arose between Cox Logistics and JSW Steel and the future business dealings that relationship generated. In the absence of an adequately pled restrictive covenant precluding Cox Logistics from future business dealings with JSW Steel, the Court finds no legal support for PLS's claim that Cox Logistics unjustly enriched itself by capitalizing on its relationship with

---

[7]     Nor does PLS allege that it had not been paid for its brokerage of the transportation services Cox Logistics provided to JSW Steel.

JSW Steel nor does PLS supply any authority to support such a restraint on free trade.[8]  Thus, because PLS has failed to plead circumstances that would make it inequitable for Cox Logistics to retain the benefit of this relationship without payment of its value to PLS, the Court finds that PLS has failed to plead satisfactorily the third element of its unjust enrichment claim.

Finally, without averring additional factual details regarding Cox Management and Cox Brokerage, PLS summarily concludes that all three Defendants unjustly enriched themselves at the expense of PLS.  (Id. ¶ 53).  Since the Court finds that PLS has not pled a claim for unjust enrichment against Cox Logistics, the Court further finds that PLS has not pled an unjust enrichment claim against Cox Management or Cox Brokerage, whose alleged involvement in the allegations of Count II appears—at most—to be linked solely to the actions of Cox Logistics.

Accordingly, because the Court finds that PLS failed to plead a claim for unjust enrichment against Cox Logistics, Cox Brokerage and Cox Management, Count II of the Complaint will be dismissed without prejudice.

### C.  Count III: Tortious Interference with Business Relations (PLS v. Cox Logistics, Cox Brokerage and Cox Management)

PLS alleges a claim against all three Defendants for tortious interference with business relations in Count III of the Complaint.  (Id. ¶¶ 55-63).  More specifically, PLS claims that Defendants solicited business directly from JSW Steel without using PLS's brokerage services, which interfered with the exclusive shipping contract between PLS and JSW Steel, thereby causing PLS to suffer financial harm.  Defendants seek dismissal of this claim, arguing that PLS has failed to plead all the necessary elements of the tort.

---

[8]      Although PLS alleges the existence of an exclusive contract between it and JSW Steel that it contends precludes JSW Steel from accepting transportation services from providers other than through PLS (see Docket Nos. 1, ¶ 32; 1-6, ¶¶ 1, 20), the Court notes that PLS's Complaint does not allege a breach of contract claim against JSW Steel.

Under applicable Pennsylvania law, in order to recover damages for the tort of intentional interference with an existing or prospective contractual relation, a plaintiff must plead and prove the following elements:

> (1) the existence of a contractual, or prospective contractual relation between the complainant and a third party;
>
> (2) purposeful action on the part of the defendant, specifically intended to harm the existing relation, or to prevent a prospective relation from occurring;
>
> (3) the absence of privilege or justification on the part of the defendant; and
>
> (4) the occasioning of actual legal damage as a result of the defendant's conduct.

Strickland v. Univ. of Scranton, 700 A.2d 979, 985 (Pa. Super. Ct. 1997); see Germain v. Wisniewski, No. 15-1279, 2016 WL 4158994, at *7 (W.D. Pa. Aug. 5, 2016) (citing Acumed LLC v. Advanced Surgical Servs. Inc., 561 F.3d 199, 212 (3d Cir. 2009)).  Defendants argue that PLS has failed to aver that Defendants specifically *intended* to harm PLS by interfering with PLS's contractual relationship with JSW Steel, and thus failed to plead this second element.  See Glenn v Point Park College, 272 A.2d 895, 899 (Pa. 1971) (holding that the tort of interference with contract "is an intentional one: the actor is acting as he does [f]or the purpose of causing harm to the plaintiff"); Orange Stones Co. v. City of Reading, 87 A.3d 1014, 1025 (Pa. Commw. Ct. 2014) (explaining that this tort is an intentional one, and that the actor is acting as he does for the purpose of harming the plaintiff).

To establish the necessary intent, "purposeful action" on the part of a defendant, Pennsylvania law requires that the defendant *know* of the contract and those of its terms which conferred rights on the plaintiff that were allegedly interfered with by the defendant.  See East-

<u>West Arts & Entertainment Group, Inc. v. DeYoung</u>, Civ. No. 90-2521, 1994 WL 379154, at *13 (E.D. Pa. July 11, 1994); <u>Ebasco Servs. Inc. v. PP&L Co.</u>, 402 F. Supp. 421, 452-53 (E.D. Pa. 1975) (citing <u>Klauder v. Cregar</u>, 192 A. 667, 670 (Pa. 1937)); <u>see also</u> <u>Mylan Inc. v. SmithKline Beecham Corp.</u>, 723 F.3d 413, 422 (3d Cir. 2013) (applying New Jersey law, and also citing to the Restatement (Second) of Torts, to hold that, "without knowledge of the specific contractual right, [defendant] cannot be deemed to have intentionally interfered with that right"); Restatement (Second) of Torts § 766 cmt. i (1979) ("To be subject to liability under the rule stated in this Section, the actor must have knowledge of the contract with which he is interfering and of the fact that he is interfering with the performance of the contract."). Defendants contend that PLS pled neither knowledge nor intent, and thus failed to plead a cognizable tortious interference claim.

PLS contends that the requisite knowledge and intent are to be inferred by Defendants' sophistication. PLS urges the Court to infer that Defendants knew PLS had an exclusive contract with JSW Steel because they are "sophisticated parties in both freight carrier and freight brokerage businesses" who "were familiar with these types of agreements" and who knew "the amount of loads that they were getting to ship out of JSW[.]" (Oral Argument, <u>supra</u>, at 2 n.3). Arguing that Defendants are "sophisticated parties" does not allege that they knew of this particular contract between PLS and JSW Steel or of the contract's terms. As counsel for Defendants explained at oral argument on the subject, "[H]ow could we not be aware of an exclusivity contract? Easily. We didn't know of it. We didn't know whether there is one or whether [there] wasn't one." (<u>Id.</u>). The Complaint is devoid of allegations that Defendants actually knew the terms of PLS's relationship with JSW Steel, and merely being a sophisticated participant in the same industry with knowledge of JSW's shipping volume does not establish

that Defendants knew whether the PLS-JSW Steel relationship was exclusive.  Drawing such an attenuated inference from the facts actually pled would not be reasonable and would be speculative on the part of the Court.  See Iqbal, 556 U.S. at 678; Twombly, 550 U.S. at 555-56

PLS further contends that, even if Defendants did not know that the PLS-JSW relationship was exclusive "despite their sophisticated knowledge," they were nonetheless put on notice of PLS's exclusive contract with JSW Steel when PLS sent a letter to all of its carriers on April 6, 2020  (Oral Argument, supra, at 2 n.3; Docket No. 1-7) and then sent Cox Logistics a follow-up "cease and desist" letter on April 10, 2020.  (Oral Argument, supra, at 2 n.3; Docket No. 1-8).

However, these letters do not provide the explicit notice that PLS claims.  PLS's letter to Cox Logistics (as one of PLS's JSW Steel Partner-Carriers) dated April 6, 2020 notifies carriers of some payment issues it was having with JSW Steel; it reminds carriers that, under the Terms of Use (which the Court has found are not adequately alleged to be contract terms under which Cox Logistics operated), carriers agreed not to back solicit or circumvent PLS's services; and it quotes a portion[9] of the clause in the Terms of Use regarding back-solicitation/circumvention. (Docket No. 1-7).  PLS's letter to Cox Logistics dated April 10, 2020 asserts that Cox Logistics breached its contract with PLS by communicating with JSW Steel and demands that Cox Logistics cease and desist from any further direct communication with JSW Steel. (Docket No. 1-8).  This second letter also describes a billing dispute PLS was having with JSW Steel.  (Id.). The focus of this letter was to emphasize that Cox Logistics' purported contract with PLS prohibited Cox Logistics from communicating directly with PLS's shippers such as JSW Steel in

---

[9]        The letter states that ". . .  we want to remind our carriers that under the PLS Pro Terms of Use: 'CARRIER agrees not to . . . back solicit or circumvent the services of [PLS].'"  (Docket No. 1-7).  Yet, the full sentence in the Terms of Use from which it is taken states: "CARRIER agrees not to *use this Site to identify shippers of freight and* back solicit or circumvent the services of PLSPRO.com." (Docket No. 1-2 at 5, ¶ 11) (omitted text italicized for emphasis).

circumvention of PLS's services. While this second letter states that JSW Steel is also prohibited from circumventing PLS's services (id. at 2-3), nothing in this letter (nor in the earlier letter dated April 6, 2020) notifies Defendants of an exclusive contract between PLS and JSW Steel or otherwise avers the basis for such prohibition.  Nor do either of these letters contend that Cox Logistics interfered with PLS's contract with JSW Steel.

The Court concludes, therefore, that PLS's designation of Defendants as "sophisticated parties" does not show that they knew of PLS and JSW Steel's exclusive contract, nor do the letters PLS cites inform Defendants that there was such an exclusive contract in place.  Since the Complaint is otherwise silent as to whether Defendants knew of such contract—and since the Complaint, in fact, specifically alleges only that Cox Brokerage and Cox Management "knew or should have known of PLS's existing relations with JSW Steel"—the Court finds that PLS has failed to allege that Defendants *knew* of the exclusivity contract between PLS and JSW Steel in order to satisfactorily plead the second element of tortious interference with business relations. (Docket No. 1, ¶ 60).

Moreover, even if the Court were to find that Defendants' knowledge of the purported exclusive contract between PLS and JSW Steel is sufficiently pled through the facts as alleged or otherwise inferred, nowhere in the Complaint does PLS allege facts showing *purposeful action* on the part of Defendants specifically intended to harm the PLS-JSW contract.  See Strickland v. Univ. of Scranton, 700 A.2d at 985.  The Court notes that PLS alleges in the Complaint that Defendants *intentionally contacted and solicited* business from JSW Steel, inducing JSW Steel to breach its contract with PLS and enter into shipping contract(s) with Defendants instead. (Docket No. 1, ¶¶ 57, 59).  However, intentional contact and solicitation of business is not the same as purposeful action specifically intending to harm a party or to interfere with a party's

contract, even though harm to a party may be a result of such contact or solicitation.  See Central Transport, LLC v. Atlas Towing, Inc., 884 F. Supp. 2d 207, 214 n.3 (E.D. Pa. 2012) (noting that it is not sufficient that alleged harm be a "mere byproduct" of a defendant's conduct).  PLS also alleges that Defendants' solicitation *resulted in* the repudiation and breach of the business agreements between PLS and JSW Steel, which does not speak to Defendants' intent.  (Docket No. 1, ¶ 58).  Additionally, PLS alleges that *"[t]hrough such improper conduct,"* Defendants *"sought to induce* JSW Steel to discharge PLS" and to contract with Cox Logistics and/or Cox Brokerage instead, which also does not allege the necessary purposeful action specifically intended to harm the PLS-JSW contract.  (Id. ¶ 61 (italics added)).  The Complaint, quite simply, does not include any allegations of purposeful action by Defendants specifically intended to harm PLS's contract with JSW Steel, as is required to plead the second element of its claim of tortious interference with business relations.

The Court therefore finds that PLS has failed to state a claim of tortious interference with business relations.  Accordingly, Count III of the Complaint will be dismissed without prejudice.

### D. **Count IV:  Misappropriation of Trade Secrets (PLS v. Cox Logistics, Cox Brokerage, and Cox Management)**

In Count IV of its Complaint, PLS alleges a claim against all three Defendants[10] for actual or threatened misappropriation of trade secrets in violation of Pennsylvania's Uniform Trade Secrets Act ("PUTSA"), 12 Pa. C.S. § 5301 et seq., and the Defend Trade Secrets Act of

---

[10]     Again, in Count IV, PLS attempts to state a claim against all three Defendants, but the allegations specific to that claim involve only Cox Logistics and, to a lesser extent, Cox Brokerage, while Cox Management is not mentioned at all.  The only alleged connections of Cox Management to the claim are the general allegations, incorporated into Count IV, that Cox Management "is aware of and encouraging or actively assisting with Cox Logistics' improper conduct by nature of managers or other employees it shares with Cox Logistics," and that it shares "owners and members with Cox Logistics."  (Docket No. 1, ¶¶ 35, 60, 64).  PLS does not aver in its Complaint that the entities' corporate structures should be disregarded and, in its brief opposing Defendants' motion to dismiss, PLS stated that it "is asserting claims against Defendants for the acts or omissions of each Defendant." (Docket No. 15 at 4).  At oral argument, however, counsel for PLS asserted that it is PLS's contention that Defendants are "intermingled." (Oral Argument, supra, at 2 n.3).

2016 ("DTSA"), 18 U.S.C. § 1836.  (Docket No. 1, ¶¶ 64-83).  PLS alleges that the trade secrets that Defendants misappropriated—or threatens to misappropriate—include, but are not limited to:

> i) the identity of PLS's Partner-Carriers, particularly those who have moved freight for JSW Steel; ii) the regionality of PLS's Partner-Carriers, *i.e.,* which carriers reliably move particular traffic lanes); iii) the frequency and how often particular Partner-Carriers are available or physically present in a given region and the frequency of shipments to certain geographic regions; iv) the cost, revenue and profitability of certain traffic lanes; and v) the identity of JSW employees who are responsible for awarding shipping contracts.

(Id. ¶ 67).  Defendants argue, however, that this claim should be dismissed because it fails to allege both the existence of protected trade secrets, and that Defendants "misappropriated" (or threaten to "misappropriate") PLS's alleged trade secrets.

In considering a claim for trade secret misappropriation under the DTSA or PUTSA, generally, the threshold inquiry is whether the allegedly misappropriated information is subject to trade secret protection.  See Pittsburgh Logistics Sys., Inc. v. LaserShip, Inc., No. 2:18-cv-1382, 2019 WL 2443035, at *10 (W.D. Pa. June 12, 2019) (citing Fishkin v. Susquehanna Partners, G.P., 340 Fed. Appx. 110, 118-19 (3d Cir. 2009)).  Upon consideration of the Complaint, as well as the parties' briefing and oral argument on this issue, however, the Court finds that — even if PLS adequately alleged the existence of protected trade secrets under PUTSA and the DTSA — PLS has not alleged actual or threatened *misappropriation* of trade secrets by Defendants under those statutes.

"Misappropriation" under 18 U.S.C. § 1839(5) and 12 Pa. C.S. § 5302 includes:

> **(A)** *acquisition* of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or

**(B)** *disclosure or use* of a trade secret of another without express or implied consent by a person who--

    **(i)**  used improper means to acquire knowledge of the trade secret;

    **(ii)** at the time of disclosure or use, knew or had reason to know that the knowledge of the trade secret was--

        **(I)**  derived from or through a person who had used improper means to acquire the trade secret;

        **(II)**  acquired under circumstances giving rise to a duty to maintain the secrecy of the trade secret or limit the use of the trade secret; or

        **(III)** derived from or through a person who owed a duty to the person seeking relief to maintain the secrecy of the trade secret or limit the use of the trade secret; or

    **(iii)**  before a material change of the position of the person, knew or had reason to know that--

        **(I)**  the trade secret was a trade secret; and

        **(II)**  knowledge of the trade secret had been acquired by accident or mistake[.]

18 U.S.C. § 1839(5) (italics added); see also 12 Pa. C.S. § 5302 (containing similar language, but different numbering).

    Additionally, the statutory term "improper means:"

    **(A)** includes theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage through electronic or other means; and

    **(B)**  does not include reverse engineering, independent derivation, or any other lawful means of acquisition[.]

18 U.S.C. § 1839(6); see also 12 Pa. C.S. § 5302 (containing language similar to Section (A)).

The Court notes, first, that PLS does not clearly aver in its Complaint *what* specific conduct constitutes "misappropriation" pursuant to these statutes, nor whether such conduct is based on "acquisition" and/or "disclosure or use" of its trade secrets.  Upon careful consideration of the Complaint and viewing the factual allegations therein in the light most favorable to the plaintiff as the non-movant, the Court finds that it is devoid of allegations that would establish misappropriation by "acquisition" or "disclosure or use"  as those terms are defined in 18 U.S.C. § 1839(5) and 12 Pa. C.S. § 5302.

In support of its misappropriation claim, PLS alleges that its customer "JSW Steel has actual or constructive possession of competitive, protectable and confidential information that has significant value to PLS, and to any other third-party logistics broker," and that Cox Logistics "in addition to being an asset-based motor carrier, operates the freight brokerage company Cox Brokerage," which is "directly competitive with PLS."  (Docket No. 1, ¶ 66). PLS's Complaint further alleges that "[b]ecause Cox Logistics and/or Cox Brokerage is providing services directly to PLS's customer JSW Steel, Cox Logistics *has or will have direct access to* PLS's confidential information and trade secrets."  (Id. ¶ 67 (emphasis added)).  The Complaint also avers that "Cox Logistics and/or Cox Brokerage would have reason to know that any and all of PLS's trade secrets they *have or will acquire* will be procured only by *improper means*."  (Id. ¶ 73 (emphasis added)).

These conclusory averments notwithstanding, PLS has not pled any factual allegations as to if or how Defendants acquired any of its putative trade secrets as delineated in paragraph 67 of the Complaint. PLS seems to suggest that Defendants acquired these putative trade secrets (such as the identities of other partner-carriers, the frequency and scope of their services to PLS's customers such as JSW Steel, and the costs, revenues, and profitability of their traffic lanes, etc.)

via osmosis.   See, e.g., Pittsburgh Logistics Sys., Inc. v. LaserShip, Inc., 2019 WL 2443035, at *11 (holding that a plaintiff's belief that a former employee has or will use information for a new employer's benefit was insufficient to support a conclusion that any trade secrets were or will be misappropriated, even if that belief were taken as true); AutoTrakk, LLC v. Automotive Leasing Specialists, Inc., No. 4:16-cv-1981, 2017 WL 2936730, at *5 (M.D. Pa. July 10, 2017) (holding that the plaintiff's "open-ended style of pleading" left the question of how precisely the alleged misappropriation was implemented "entirely up to the reader's imagination"); Bioquell, Inc. v. Feinstein, No. 10-2205, 2010 WL 4751709, at *6 (E.D. Pa. Nov. 23, 2010) (holding that the plaintiff made no effort to identify what conduct the defendants engaged in so as to conclude that proprietary information has been and will continue to be used, and noting that the Court would not "attempt to fill-in where a complaint is lacking").

The only other "improper means" through which PLS alleges its putative trade secrets have been or will be *acquired* is "Cox Logistics and/or Cox Brokerage's . . . wrongful and tortious interference with PLS's business relations with JSW Steel, and/or Cox Logistics' breach of its contract with PLS."  (Doc. No. 1, ¶¶ 70, 71; Oral Argument, supra, at 2 n.3).   See 18 U.S.C. § 1839(5)(A); 12 Pa. C.S. § 5302.   As discussed, supra, the Court has found that PLS's claims for breach of contract and tortious interference with business relations are not adequately pled.   Therefore, PLS has not alleged facts to support its claim that Defendants have acquired (or will acquire) PLS's alleged trade secrets by "improper means," as defined by 18 U.S.C. § 1839(6) and 12 Pa. C.S. § 5302, via breach of the Terms of Use or tortious interference with the PLS-JSW Steel contract.   Accordingly, the Court finds that PLS has failed to allege actual or threatened misappropriation of trade secrets via *acquisition.*   See 18 U.S.C. § 1839(5)(A); 12 Pa. C.S. § 5302.

To the extent that PLS is attempting to state a claim for actual or threatened misappropriation of trade secrets based on Defendants' *disclosure or use* of its alleged trade secrets, as defined in 18 U.S.C. § 1839(5)(B) and 12 Pa. C.S. § 5302, the Court — again viewing the factual allegations in the light most favorable to the plaintiff — notes that the Complaint merely alleges in a conclusory way that "Cox Logistics is sharing, has shared, or is offering to share PLS's confidential information with Cox Brokerage" *(i.e.,* alleged *disclosure* of such information).   (Docket No. 1, ¶ 74).   PLS's Complaint also alleges that Cox Logistics "is soliciting or will solicit" PLS's other carriers (*i.e.,* alleged *use* of PLS's confidential information), which it contends is "tantamount to misappropriation of PLS's confidential information," because the identity of such carriers "is an important ingredient of PLS's 'secret sauce.'"   (Id. ¶ 40).   However, logic dictates that PLS cannot adequately plead that Cox Logistics disclosed or used its trade secrets without first pleading that Cox Logistics acquired or otherwise possessed those putative trade secrets.   See discussion, supra.

The Complaint is devoid of any factual averments that JSW Steel provided Defendants with information pertaining to the identities or business terms of PLS's partner-carriers, whether by "improper means" (or otherwise) as required, alternatively, by Section 1839(5)(B)(ii), that at the time of the actual or threatened disclosure or use, Cox Logistics knew or had reason to know that the knowledge of the trade secrets was:  (I) derived from a person (here, JSW Steel) who had used "improper means" to acquire the information; (II) acquired under circumstances giving rise to a duty on the part of Cox Logistics to keep that knowledge secret or limit its use; or (III) derived from a person (here, JSW Steel) who owed a duty to PLS to keep such information secret.  See 18 U.S.C. § 1839(5)(B)(ii); 12 Pa. C.S. § 5302.

Therefore, because PLS has failed to allege the facts required by the applicable statutes to support its claim that Defendants disclosed or used (or threaten to disclose or use) PLS's trade secrets, the Court also finds that PLS has failed to allege actual or threatened misappropriation of trade secrets by *disclosure or use*.

In sum, PLS has failed to allege specific conduct of Defendants, or by any of them individually, that constitutes actual or threatened misappropriation of trade secrets, nor can the Court draw reasonable inferences from what has been pled to discern conduct that could constitute such misappropriation.

The Court therefore finds that PLS has failed to state a claim for actual or threatened misappropriation of trade secrets under PUTSA and the DTSA.  Accordingly, Count IV of the Complaint will be dismissed without prejudice.

### E.   Count V:  Preliminary and Permanent Injunction (PLS v. Cox Logistics, Cox Brokerage, and Cox Management)

In Count V, PLS seeks to enjoin Defendants from:  soliciting or attempting to contract with JSW Steel or with carriers that have utilized PLS's services to move freight for JSW Steel; using, disclosing, or retaining PLS's confidential and/or proprietary information; and cooperating with or encouraging others to engage in conduct that constitutes a tort or a violation of (or interference with) various existing or prospective contracts.  (Docket No. 1 at 23 ("Wherefore" clause)).  While PLS requests this preliminary and permanent injunctive relief based on the other claims it attempts to plead in the Complaint, it does not assert a separate cause of action in Count V.  (Id. ¶¶ 84-103).  Defendants assert, correctly, that an injunction is a form of relief and not a standalone cause of action, and PLS does not maintain that its request for preliminary and permanent injunctive relief should be pled as a separate and distinct cause of action.  See Pittsburgh Logistics Sys., Inc. v. LaserShip, Inc., 2019 WL 2443035, at *3.  Thus, PLS requests,

if the Court grants Defendants' motion to dismiss Count V, that PLS be given an opportunity to incorporate elsewhere in the Complaint the allegations made and the request for relief sought in Count V.

Because Counts I through IV are being dismissed without prejudice, there are no counts remaining in the Complaint into which PLS can presently incorporate the allegations made and the request for relief sought in Count V.  Therefore, Count V will also be dismissed without prejudice, but PLS will be given leave to amend the Complaint to request injunctive relief if other counts are amended and restated.

### IV. Conclusion

For the reasons stated, Defendants' Motion to Dismiss is GRANTED for failure to state claims upon which relief can be granted pursuant to Federal Rule of Civil Procedure 12(b)(6).

Accordingly, all Counts of the Complaint are DISMISSED WITHOUT PREJUDICE to amendment with sufficient facts to state a claim.  Additionally, for the reasons stated, Plaintiff is permitted to amend the Complaint in order to incorporate therein the allegations made and the request for the relief sought in Count V.

An appropriate Order follows.


Dated:  March 3, 2021                                    *s/ W. Scott Hardy*
                                                                 W. Scott Hardy
                                                                 United States District Judge


cc/ecf:  All counsel of record